IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs July 1, 2024

**IN RE LYNELL S.**

**Appeal from the Juvenile Court for Knox County**
**No. 216969      Timothy E. Irwin, Judge**

_____

**No. E2024-00243-COA-R3-PT**

_____

This appeal concerns the termination of a father's parental rights. The Tennessee Department of Children's Services ("DCS") filed a petition in the Juvenile Court for Knox County ("the Juvenile Court") seeking to terminate the parental rights of Charles S. ("Father") to his minor son, Lynell S. ("the Child"). Father pled guilty to aggravated assault on the Child's mother. After a hearing, the Juvenile Court entered an order terminating Father's parental rights to the Child on grounds of abandonment by wanton disregard, substantial noncompliance with the permanency plans, and failure to manifest an ability and willingness to assume custody. Father appeals, arguing among other things that he addressed his domestic violence issues by taking certain classes, even though he assaulted Mother after having taken these classes. We find that all three grounds found for termination were proven by clear and convincing evidence. We find further by clear and convincing evidence, as did the Juvenile Court, that termination of Father's parental rights is in the Child's best interest. We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed;**
**Case Remanded**

D. MICHAEL SWINEY, C.J., delivered the opinion of the court, in which FRANK G. CLEMENT, JR., P.J., M.S., and ARNOLD B. GOLDIN, J., joined.

Ben H. Houston II, Knoxville, Tennessee, for the appellant, Charles S.[1]

Jonathan Skrmetti, Attorney General and Reporter, and Jason R. Trautwein, Assistant Attorney General, for the appellee, the Tennessee Department of Children's Services.

Shelley S. Breeding, Guardian ad Litem.[2]

_____

[1] Father had a different lawyer at trial.
[2] The Guardian ad Litem adopted DCS's argument.

# OPINION

## Background

The Child was born to Father and Breann T. ("Mother") in March 2022.[3] In June 2022, DCS filed a petition alleging that the Child was dependent and neglected based on "parental homelessness, maternal mental health concerns, maternal alcohol/drug use concerns, paternal placement on the sex offender registry, and parental inability to provide appropriate care and supervision." The Child entered state custody. At a September 2022 hearing, Mother and Father stipulated that the Child was dependent and neglected "due to Mother's and Father's substance abuse issues, lack of stable housing, and inability to provide appropriate care and supervision." The Child remained in foster care.

In July 2022, a permanency plan was crafted for Father. Under the plan, Father's responsibilities included: obtain and maintain housing; keep his home free from illegal activity; complete a mental health assessment and follow recommendations; complete an A&D assessment and follow recommendations; complete a psychosexual evaluation and follow recommendations; visit the Child; pay child support; and obtain and maintain a legal source of income. Father signed the Criteria and Procedures for Termination of Parental Rights. In September 2022, the plan was ratified. In January 2023, the plan was revised, with the revised plan ratified in April 2023. In April 2023, Father was arrested and charged with aggravated assault against Mother. Father later pled guilty to one count of aggravated assault.

On June 14, 2023, DCS filed a petition in the Juvenile Court seeking to terminate Father's parental rights to the Child. DCS alleged against Father the grounds of abandonment by wanton disregard, substantial noncompliance with the permanency plans, and failure to manifest an ability and willingness to assume custody. DCS also alleged that termination of Father's parental rights is in the Child's best interest. In December 2023, the Juvenile Court heard DCS's petition.

 Father testified first. He was still incarcerated as of the hearing. Father said that he was preparing to return to his old job and residence in Kansas City when the Child entered state custody. Asked why he was in jail, Father said that "[w]e had a bad situation occur." He acknowledged pleading guilty to aggravated assault against Mother. However, Father said that the police report was "plagiarized." Father said that he "didn't do what they said I did . . . ." Asked what he had done, Father said that he "[o]verreacted." Father completed a mental health assessment and an alcohol and drug assessment. Father also underwent a psychosexual evaluation. Asked about its recommendations, Father testified:

---

[3] Mother has surrendered her parental rights. We refer to Mother only as she relates to Father's case.

"They said some type of treatment, but, you know, I didn't understand that because, see, my offense happened in the eighties." Father said that he completed parenting education. He said that he did not know at that point when he would be getting out of jail, but he would know next month. Asked if he had a home for the Child, Father said: "I suppose if I call some of my kin, I could come up with one."

Father was asked by his attorney if there was anything else he would like to tell the court. Father responded by saying that he had 22 children besides the Child. He said that they are all adults and have children of their own now. He did not have custody of these children when they were young; their mothers did. Father said that he was 66 years old and in good health. Father testified further that he has written kids books and horror novels and wants the Child to be able to read his work. When the Juvenile Court observed that the Child could read Father's books whether he lived with him or not, Father said: "Yeah, but if he don't know who I am, then that's a different thing." Father stated that, before he went to jail, he visited the Child whenever he could.

Asked by the Juvenile Court what sex offense he committed, Father testified that he once had a girlfriend who was too young. Asked how young, Father replied 12 years old. Father was 25 or 26 years old at the time. Father was then questioned by the Guardian ad Litem on the terms of his plea agreement. The minimum sentence Father faced was three years; the recommended sentence was eight years. It was unclear when, or if, Father might get released on probation.

Savannah Moseley ("Moseley"), a DCS family service worker on the case, testified next. Asked what had changed in Father's revised permanency plan, Moseley said that specific action steps were added to address concerns about domestic violence. Moseley said that Mother sometimes appeared bruised. Moseley then testified to Father's actions on his permanency plan obligations. Father completed a psychosexual evaluation. The report concluded that Father is a high-level risk to re-offend. It was recommended that Father enroll in a sex offender outpatient treatment program. It was also recommended that Father not be allowed around anyone under 15 years old without supervision. Moseley and her supervisor went over these recommendations with Father. According to Moseley, Father was "adamant that he was not going to comply with the recommendations." Father later reiterated this position to Moseley. With respect to housing, Father was living in a hotel in June 2022. Father worked to get a voucher to obtain housing. His status as a sex offender made it difficult for him to obtain housing. Father was still living at the hotel when he was incarcerated.

Before the April 2023 incident resulting in his incarceration, Father had engaged with a domestic violence provider called "Healing the Home." Father did not complete the service due to his incarceration. Father did complete an alcohol and drug assessment.

Father also attended 11 sessions of parenting classes but was unable to complete the service due to his incarceration. Moseley testified that Father visited the Child weekly. There were two missed visitations. According to Moseley, Father relied "on the mother to do all of the traditional parenting, the diapering, the feeding, the cleaning up, but he would engage with the child." The Child has special needs related to mobility. Moseley said that Father did not acknowledge the Child's special needs and believed that they were a result of his placement. With respect to employment, Father initially had a job and provided verification. Father later lost this job. Following this, Father reported working at other places, but failed to provide DCS with verification. Regarding transportation, Father used a bus pass provided by DCS. Moseley testified that the Child is in a DCS foster home, and he is receiving what he needs.

Last to testify was the Child's foster mother ("Foster Mother"). The Child was then 20 months of age. Foster Mother said that he is "doing great." Foster Mother and her husband have three biological children and two other foster children in their home. She said that they all get along. Foster Mother testified that she and her husband were in a position, and willing, to adopt the Child if that became a possibility. Foster Mother said that she could not think of anything that the Child needs that he is not currently receiving. Foster Mother stated that her home has six bedrooms. The Child attends daycare. Foster Mother said that she works full-time as does her husband. Foster Mother testified to the special services that the Child is engaged in: "He's in occupational and physical therapy twice a week for an hour. And he does developmental therapy for an hour a week. And also speech therapy." The Child was progressing in those areas.

In February 2024, the Juvenile Court entered its final order in which it terminated Father's parental rights to the Child on grounds of abandonment by wanton disregard, substantial noncompliance with the permanency plans, and failure to manifest an ability and willingness to assume custody of the Child, all by the standard of clear and convincing evidence. The Juvenile Court found further, also by clear and convincing evidence, that termination of Father's parental rights is in the Child's best interest. The Juvenile Court stated, as relevant:

> GROUND I.
> ABANDONMENT BY INCARCERATED PARENT/WANTON DISREGARD
> T.C.A. §§ 36-1-113(g)(1) and 36-1-102(1)(A)(iv), -102(1)(B), -102 (1)(C), -102(1)(D), and -102(1)(E)
> 9. [Father] was in jail part or all of the four months just before the petition was filed.

10. [Father] was arrested on April 10, 2023, on charges of Aggravated Assault and has remained in jail since that date. The victim of [Father's] assault was the mother of [the Child].

11. [Father] has pled guilty to Aggravated Assault and the Knox County Criminal Court accepted his guilty plea on December 15, 2023.

12. The Court finds that the minor child was one (1) year of age when the Department's termination petition was filed.

13. [Father] has engaged in conduct that exhibits a wanton disregard for the child's welfare by assaulting the mother of the child, which resulted in his incarceration since April 10, 2023, and his subsequent guilty plea to Aggravated Assault.

14. DCS has proven, by clear and convincing evidence, the ground of abandonment by wanton disregard against [Father].

GROUND II.
SUBSTANTIAL NONCOMPLIANCE WITH THE PERMANENCY PLAN
T.C.A §§ 36-1-113(g)(2) and 37-2-403

15. After the child came into state custody, DCS created permanency plans for the child. The Court finds that, in sum, there have been two (2) number of permanency plans in the underlying dependency and neglect proceedings that gave rise to this cause.

16. The permanency plans listed a number of requirements that [Father] needed to satisfy before the child could safely be returned home. The initial plan gave [Father] until January 11, 2023, to satisfy those requirements.

17. The initial plan required [Father] to complete the following tasks:

a. Obtain and maintain safe and stable housing and provide proof to DCS.

b. Complete a mental health assessment, including addressing domestic violence, and follow the recommendations.

c. Complete an alcohol and drug assessment and submit to random drug screening.

d. Complete a psychosexual evaluation and follow the recommendations.

e. Remain a law abiding citizen.

f. Visit the child.

g. Pay child support.

h. Obtain a legal form of transportation.

i. Comply with Court orders and maintain contact with DCS.

j. Provide DCS with verification of completion of tasks.

k. Obtain and maintain a legal source of income and provide proof to DCS.

1. Sign necessary releases.

m. Maintain regular contact with DCS and provide updated contact information.

18. [Father] attended the permanency plan staffing and signed the criteria and procedures for termination of parental rights on July 13, 2022.

19. The Juvenile Court of Knox County ratified the initial permanency plan on September 8, 2022, as in the child's best interest and found that the requirements for [Father] were reasonably related to remedying the reasons for foster care.

20. The permanency plan was revised on January 19, 2023. The revised plan repeated the requirements in the initial plan. The revised plan gave [Father] until July 17, 2023 to satisfy the requirements. [Father] participated in the development of this plan.

21. The Juvenile Court of Knox County ratified the revised permanency plan on April 13, 2023, as in the child's best interest and found that the requirements for [Father] were reasonably related to remedying the reasons for foster care.

22. The Court finds that [Father] is in substantial noncompliance with the responsibilities and requirements set out for them in the permanency plans. [Father] has not completed the following tasks:

a. He refused to comply with the recommendations of the psychosexual evaluation. The evaluation indicated a high level of risk to reoffend and noted that substance abuse would increase the risk level. He was recommended Sex Offender treatment, but refused. He refused this treatment on February 15, 2023, and again on March 31, 2023.

b. He has not completed parenting education.

c. He has not obtained and maintained suitable housing.

d. He is currently in jail due to aggravated assault charges involving the mother of this child.

e. He has not addressed domestic violence issues.

f. He has no[t] provided proof of income.

23. The Court finds that, as of the date of hearing, the permanency plans are reasonable and related to remedying the reasons for which the child was placed into foster care, such that, had [Father] cooperated with the same, it would have addressed the reasons for which the child was in DCS custody.

24. DCS has proven, by clear and convincing evidence, the ground of substance noncompliance with the permanency plan against [Father].

GROUND III.
FAILURE TO MANIFEST [AN] ABILITY AND WILLINGNESS TO ASSUME CUSTODY
T.C.A. §§ 36-1-113(g)(14)

25. [Father] has failed to manifest, by act or omission, an ability and willingness to personally assume legal and physical custody or financial responsibility of the child.

26. [Father] has been incarcerated since April 10, 2023, and has pled guilty to aggravated assault in which the victim was the mother of the child at issue in this case.

27. [Father] has not complied with recommended sex offender treatment.

28. [Father] has not completed parenting education.

29. [Father] has not obtained and maintained suitable housing.

30. [Father] has not addressed domestic violence issues.

31. [Father] has not provided proof of income.

32. Placing the child in [Father's] legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child.

33. DCS has proven, by clear and convincing evidence, the ground for termination contained in . . . T.C.A. §§ 36-1-113(g)(14) against [Father].

BEST INTEREST
T.C.A. § 36-1-113(i)

34. The Court finds that, after having found that grounds exist to terminate the parental rights of [Father], the Court must then analyze whether or not it is in the child's best interest for termination to be granted. The Court further finds that the nonexclusive list of best interest factors which the Court must consider are contained in Tennessee Code Annotated § 36-1-113(i).

35. The Court finds that the best interest factor contained in T.C.A. § 36-1-113(i)(1)(A) is applicable in this matter. Thus, the Court finds it is in the best interest of the minor child for termination to be granted as to [Father], in that termination of parental rights will have a positive impact on the child's critical need for stability and continuity of placement throughout the child's minority. Thus, the Court finds that this factor weighs in favor of terminating [Father's] parental rights.

36. The Court finds that the best interest factor contained in T.C.A. § 36-1-113(i)(1)(B) is applicable in this matter. Thus, the Court finds that it is in the child's best interest for termination to be granted as to [Father], in that a change of caregivers and physical environment from the child's current placement would likely have a negative effect on the child's emotional, psychological and/or medical condition. The child is bonded with the foster family, who provide for his needs. Thus, the Court finds that this factor weighs in favor of terminating [Father's] parental rights.

37. The Court finds that the best interest factor contained in T.C.A. § 36-1-113(i)(1)(C) is applicable in this matter. Thus, the Court finds that it is in the child's best interest for termination to be granted as to [Father], in that the

parents have not demonstrated continuity and stability in meeting the child's basic material, educational, housing and safety needs. [Father] has not demonstrated stability in his own life and is now incarcerated. Prior to incarceration, [Father] was homeless and unable to meet his own housing needs. [Father] cannot meet this child's needs. Thus, the Court finds that this factor weighs in favor of terminating [Father's] parental rights.

38. The Court finds that the best interest factor contained in T.C.A. § 36-1-113(i)(1)(D) is applicable in this matter. Thus, the Court finds [sic] would assert that it is in the child's best interest for termination to be granted as to [Father], in that the parents and child do not have a secure and healthy parental attachment. Further, there is not a reasonable expectation that the parents will be able to create such an attachment. [Father] has refused to comply with the recommendations of his psychosexual evaluation. Further, there is not a reasonable expectation that the parent will be able to create such an attachment. Thus, the Court finds that this factor weighs in favor of terminating [Father's] parental rights.

39. The Court finds that the best interest factor contained in T.C.A. § 36-1-113(i)(1)(E) is not applicable in this matter and does not weigh in favor of termination.

40. The Court finds that the best interest factor contained in T.C.A. § 36-1-113(i)(1)(F) is not applicable in this matter and does not weigh in favor of termination.

41. The Court finds that the best interest factor contained in T.C.A. § 36-1-113(i)(1)(G) is not applicable in this matter and does not weigh in favor of termination.

42. The Court finds that the best interest factor contained in T.C.A. § 36-1-113(i)(1)(H) is applicable in this matter. Thus, the Court finds that . . . it is in the child's best interest for termination to be granted as to [Father], because the child has created a healthy parental attachment with another person or persons in the absence of the parents. The child is bonded with the foster family, where he has lived since his removal into foster care. Thus, the Court finds that this factor weighs in favor of terminating [Father's] parental rights.

43. The Court finds that the best interest factor contained in T.C.A. § 36-1-113(i)(1)(I) is applicable in this matter. Thus, the Court finds that . . . it is in the child's best interest for termination to be granted as to [Father], because the child has emotionally significant relationships with persons other than parents and caregivers, including biological or foster siblings, and will not negatively impact the child's access to information about the child's heritage. Thus, the Court finds that this factor weighs in favor of terminating [Father's] parental rights.

44. The Court finds that the best interest factor contained in T.C.A. § 36-1-113(i)(1)(J) is applicable in this matter. Thus, the Court finds that [it is] in the child's best interest for termination to be granted as to [Father], because there is criminal activity in the parents' home or because the parents use alcohol, controlled substances and/or controlled substance analogues which render the parents unable to consistently care for the child in a safe and stable manner. [Father] was arrested on April 10, 2023, on charges of Aggravated Assault and has remained in jail since that date. The victim of [Father's] assault was the mother of the child. Thus, the Court finds that this factor weighs in favor of terminating [Father's] parental rights.

45. The Court finds that the best interest factor contained in T.C.A § 36-1-113(i)(1)(K) is applicable in this matter. Thus, the Court finds that it is in the child's best interest for termination to be granted as to [Father], because [Father has] not taken advantage of available programs, services, or community resources to assist [him] in making a lasting adjustment of circumstances, conduct and/or conditions. [Father] is currently incarcerated and has stated that he will not comply with the recommendations of his psychosexual evaluation. Thus, the Court finds that this factor weighs in favor of terminating [Father's] parental rights.

46. The Court finds that the best interest factor contained in T.C.A. § 36-1-113(i)(1)(L) is applicable in this matter. Thus, the Court finds that it is in the child's best interest for termination to be granted as to [Father], because the Department has made reasonable efforts to assist [Father] in making a lasting adjustment in their conduct or circumstances, but, despite these efforts, the parents have made no change in their conduct or lifestyle. [Father] has refused to comply with the recommendations from his psychosexual evaluation, he was unable to obtain and maintain housing, and he continued to have substance abuse issues. Thus, the Court finds that this factor weighs in favor of terminating [Father's] parental rights.

47. The Court finds that the best interest factor contained in T.C.A. § 36-1-113(i)(1)(M) is applicable in this matter as to [Father]. Thus, the Court finds that it is in the child's best interest for termination to be granted as to [Father], because the parents have not demonstrated a sense of urgency in seeking custody of the child and addressing the circumstance, conduct, or conditions that made an award of custody unsafe and not in the child's best interest. Thus, the Court finds that this factor weighs in favor of terminating [Father's] parental rights.

48. The Court finds that the best interest factor contained in T.C.A. § 36-1-113(i)(1)(N) is applicable in this matter. Thus, the Court finds that it is in the child's best interest for termination to be granted as to [Father], because [Father] has shown brutality or physical, sexual, emotional, or psychological

abuse or neglect toward another child. [Father] is currently on the Sex Offender Registry for Sexual Battery and Solicitation of another to Commit Prostitution out of Florida. His classification is Violent Against Children. Thus, the Court finds that this factor weighs in favor of terminating [Father's] parental rights.

49. The Court finds that the best interest factor contained in T.C.A. § 36-1-113(i)(1)(O) is applicable in this matter. Thus, the Court finds that it is in the child's best interest for termination to be granted as to [Father], because [Father] has never provided safe and stable care for the child. Thus, the Court finds that this factor weighs in favor of terminating [Father's] parental rights.

50. The Court finds that the best interest factor contained in T.C.A. § 36-1-113(i)(1)(P) is not applicable in this matter and does not weigh in favor of termination.

51. The Court finds that the best interest factor contained in T.C.A. § 36-1-113(i)(1)(Q) is applicable in this matter. Thus, the Court finds that it is in the child's best interest for termination to be granted as to [Father], because the parents have failed to demonstrate the ability and commitment to creating and maintaining a home that meets the child's basic and specific needs and in which the child can thrive. Thus, the Court finds that this factor weighs in favor of terminating [Father's] parental rights.

52. The Court finds that the best interest factor contained in T.C.A. § 36-1-113(i)(1)(R) is applicable in this matter. Thus, the Court finds that it is in the child's best interest for termination to be granted as to [Father], because the physical environment of the parents' home is not healthy and safe for the child. Thus, the Court finds that this factor weighs in favor of terminating [Father's] parental rights.

53. The Court finds that the best interest factor contained in T.C.A § 36-1-113(i)(1)(S) is not applicable in this matter and does not weigh in favor of termination.

54. The Court finds that the best interest factor contained in T.C.A § 36-1-113(i)(1)(T) is applicable in this matter. Thus, the Court finds that it is in the child's best interest for termination to be granted as to [Father], because the mental or emotional fitness of the parents would be detrimental to the child and prevent the parent from consistently and effectively providing safe and stable care and supervision of the child. Thus, the Court finds that this factor weighs in favor of terminating [Father's] parental rights.

Father timely appealed to this Court.

## Discussion

Although not stated exactly as such, Father raises the following issues on appeal: 1) whether Father was denied fundamentally fair proceedings because he did not have an opportunity to give a closing argument; 2) whether Father was denied fundamentally fair proceedings because the Juvenile Court relied in part on evidence from an anonymous psychosexual evaluator after that evidence came in without objection by Father's trial counsel; 3) whether the Juvenile Court erred in finding the ground of abandonment by wanton disregard; 4) whether the Juvenile Court erred in finding the ground of substantial noncompliance with the permanency plans; 5) whether the Juvenile Court erred in finding the ground of failure to manifest an ability and willingness to assume custody; and 6) whether the Juvenile Court erred in finding that termination of Father's parental rights is in the Child's best interest.

As our Supreme Court has instructed regarding the standard of review in parental rights termination cases:

> A parent's right to the care and custody of her child is among the oldest of the judicially recognized fundamental liberty interests protected by the Due Process Clauses of the federal and state constitutions.[4] *Troxel v. Granville*, 530 U.S. 57, 65, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000); *Stanley v. Illinois*, 405 U.S. 645, 651, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972); *In re Angela E.*, 303 S.W.3d 240, 250 (Tenn. 2010); *In re Adoption of Female Child*, 896 S.W.2d 546, 547-48 (Tenn. 1995); *Hawk v. Hawk*, 855 S.W.2d 573, 578-79 (Tenn. 1993). But parental rights, although fundamental and constitutionally protected, are not absolute. *In re Angela E.*, 303 S.W.3d at 250. "'[T]he [S]tate as *parens patriae* has a special duty to protect minors . . . .' Tennessee law, thus, upholds the [S]tate's authority as *parens patriae* when interference with parenting is necessary to prevent serious harm to a child." *Hawk*, 855 S.W.2d at 580 (quoting *In re Hamilton*, 657 S.W.2d 425, 429 (Tenn. Ct. App. 1983)); *see also Santosky v. Kramer*, 455 U.S. 745, 747, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982); *In re Angela E.*, 303 S.W.3d at 250. "When the State initiates a parental rights termination proceeding, it seeks not merely to infringe that fundamental liberty interest, but to end it." *Santosky*, 455 U.S. at 759, 102 S.Ct. 1388. "Few consequences of judicial

---

[4] U.S. Const. amend. XIV § 1 ("[N]or shall any State deprive any person of life, liberty, or property, without due process of law . . . ."). Similarly, article 1, section 8 of the Tennessee Constitution states "[t]hat no man shall be taken or imprisoned, or disseized of his freehold, liberties or privileges, or outlawed, or exiled, or in any manner destroyed or deprived of his life, liberty or property, but by the judgment of his peers or the law of the land."

action are so grave as the severance of natural family ties." *Id.* at 787, 102 S.Ct. 1388; *see also M.L.B. v. S.L.J.*, 519 U.S. 102, 119, 117 S.Ct. 555, 136 L.Ed.2d 473 (1996). The parental rights at stake are "far more precious than any property right." *Santosky*, 455 U.S. at 758-59, 102 S.Ct. 1388. Termination of parental rights has the legal effect of reducing the parent to the role of a complete stranger and of "severing forever all legal rights and obligations of the parent or guardian of the child." Tenn. Code Ann. § 36-1-113(*l*)(1); *see also Santosky*, 455 U.S. at 759, 102 S.Ct. 1388 (recognizing that a decision terminating parental rights is "*final* and irrevocable"). In light of the interests and consequences at stake, parents are constitutionally entitled to "fundamentally fair procedures" in termination proceedings. *Santosky*, 455 U.S. at 754, 102 S.Ct. 1388; *see also Lassiter v. Dep't of Soc. Servs. of Durham Cnty., N.C.*, 452 U.S. 18, 27, 101 S.Ct. 2153, 68 L.Ed.2d 640 (1981) (discussing the due process right of parents to fundamentally fair procedures).

Among the constitutionally mandated "fundamentally fair procedures" is a heightened standard of proof – clear and convincing evidence. *Santosky*, 455 U.S. at 769, 102 S.Ct. 1388. This standard minimizes the risk of unnecessary or erroneous governmental interference with fundamental parental rights. *Id.*; *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010). "Clear and convincing evidence enables the fact-finder to form a firm belief or conviction regarding the truth of the facts, and eliminates any serious or substantial doubt about the correctness of these factual findings." *In re Bernard T.*, 319 S.W.3d at 596 (citations omitted). The clear-and-convincing-evidence standard ensures that the facts are established as highly probable, rather than as simply more probable than not. *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005); *In re M.A.R.*, 183 S.W.3d 652, 660 (Tenn. Ct. App. 2005).

Tennessee statutes governing parental termination proceedings incorporate this constitutionally mandated standard of proof. Tennessee Code Annotated section 36-1-113(c) provides:

> Termination of parental or guardianship rights must be based upon:
>
> (1) A finding by the court by clear and convincing evidence that the grounds for termination of parental or guardianship rights have been established; and

(2) That termination of the parent's or guardian's rights is in the best interests of the child.

This statute requires the State to establish by clear and convincing proof that at least one of the enumerated statutory grounds[5] for termination exists and that termination is in the child's best interests. *In re Angela E.*, 303 S.W.3d at 250; *In re F.R.R., III*, 193 S.W.3d 528, 530 (Tenn. 2006); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002). "The best interests analysis is separate from and subsequent to the determination that there is clear and convincing evidence of grounds for termination." *In re Angela E.*, 303 S.W.3d at 254. Although several factors relevant to the best interests analysis are statutorily enumerated,[6] the list is illustrative, not exclusive. The parties are free to offer proof of other relevant factors. *In re Audrey S.*, 182 S.W.3d at 878. The trial court must then determine whether the combined weight of the facts "amount[s] to clear and convincing evidence that termination is in the child's best interest." *In re Kaliyah S.*, 455 S.W.3d 533, 555 (Tenn. 2015). These requirements ensure that each parent receives the constitutionally required "individualized determination that a parent is either unfit or will cause substantial harm to his or her child before the fundamental right to the care and custody of the child can be taken away." *In re Swanson*, 2 S.W.3d 180, 188 (Tenn. 1999).

Furthermore, other statutes impose certain requirements upon trial courts hearing termination petitions. A trial court must "ensure that the hearing on the petition takes place within six (6) months of the date that the petition is filed, unless the court determines an extension is in the best interests of the child." Tenn. Code Ann. § 36-1-113(k). A trial court must "enter an order that makes specific findings of fact and conclusions of law within thirty (30) days of the conclusion of the hearing." *Id*. This portion of the statute requires a trial court to make "findings of fact and conclusions of law as to whether clear and convincing evidence establishes the existence of each of the grounds asserted for terminating [parental] rights." *In re Angela E.*, 303 S.W.3d at 255. "Should the trial court conclude that clear and convincing evidence of ground(s) for termination does exist, then the trial court must also make a written finding whether clear and convincing evidence establishes that termination of [parental] rights is in the [child's] best interests." *Id*. If the trial court's best interests analysis "is based on additional factual findings besides the ones made in conjunction with the

---

[5] Tenn. Code Ann. § 36-1-113(g)(1)-(13).
[6] Tenn. Code Ann. § 36-1-113(i).

grounds for termination, the trial court must also include these findings in the written order." *Id*. Appellate courts "may not conduct de novo review of the termination decision in the absence of such findings." *Id*. (citing *Adoption Place, Inc. v. Doe*, 273 S.W.3d 142, 151 & n. 15 (Tenn. Ct. App. 2007)).

### *B. Standards of Appellate Review*

An appellate court reviews a trial court's findings of fact in termination proceedings using the standard of review in Tenn. R. App. P. 13(d). *In re Bernard T.*, 319 S.W.3d at 596; *In re Angela E.*, 303 S.W.3d at 246. Under Rule 13(d), appellate courts review factual findings de novo on the record and accord these findings a presumption of correctness unless the evidence preponderates otherwise. *In re Bernard T.*, 319 S.W.3d at 596; *In re M.L.P.*, 281 S.W.3d 387, 393 (Tenn. 2009); *In re Adoption of A.M.H.*, 215 S.W.3d 793, 809 (Tenn. 2007). In light of the heightened burden of proof in termination proceedings, however, the reviewing court must make its own determination as to whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, amount to clear and convincing evidence of the elements necessary to terminate parental rights. *In re Bernard T.*, 319 S.W.3d at 596-97. The trial court's ruling that the evidence sufficiently supports termination of parental rights is a conclusion of law, which appellate courts review de novo with no presumption of correctness. *In re M.L.P.*, 281 S.W.3d at 393 (quoting *In re Adoption of A.M.H.*, 215 S.W.3d at 810). Additionally, all other questions of law in parental termination appeals, as in other appeals, are reviewed de novo with no presumption of correctness. *In re Angela E.*, 303 S.W.3d at 246.

*In re Carrington H.*, 483 S.W.3d 507, 521-24 (Tenn. 2016) (footnotes in original but renumbered). In conjunction with a best interest determination, clear and convincing evidence supporting any single ground will justify a termination order. *E.g., In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002).

On June 14, 2023, when DCS filed its petition, the applicable statutory grounds for termination read as follows:

(g) Initiation of termination of parental or guardianship rights may be based upon any of the grounds listed in this subsection (g). The following grounds are cumulative and nonexclusive, so that listing conditions, acts or omissions in one ground does not prevent them from coming within another ground:
(1) Abandonment by the parent or guardian, as defined in § 36-1-102, has occurred;

(2) There has been substantial noncompliance by the parent or guardian with the statement of responsibilities in a permanency plan pursuant to title 37, chapter 2, part 4; [and]

\*\*\*

(14) A parent or guardian has failed to manifest, by act or omission, an ability and willingness to personally assume legal and physical custody or financial responsibility of the child, and placing the child in the person's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child[.]

Tenn. Code Ann. § 36-1-113(g) (West May 11, 2023 to June 30, 2023).

The relevant ground of abandonment found against Father, that of abandonment by wanton disregard, was defined as follows:

(1)(A) For purposes of terminating the parental or guardian rights of a parent or parents or a guardian or guardians of a child to that child in order to make that child available for adoption, "abandonment" means that:

\*\*\*

(iv) A parent or guardian is incarcerated at the time of the filing of a proceeding, pleading, petition, or amended petition to terminate the parental rights of the parent or guardian of the child who is the subject of the petition for termination of parental rights or adoption, or a parent or guardian has been incarcerated during all or part of the four (4) consecutive months immediately preceding the filing of the action and has:

\*\*\*

*(c)* With knowledge of the existence of the born or unborn child, engaged in conduct prior to, during, or after incarceration that exhibits a wanton disregard for the welfare of the child[.]

Tenn. Code Ann. § 36-1-102 (1)(A)(iv)(c) (West May 5, 2023 to June 30, 2023).

We first address whether Father was denied fundamentally fair proceedings because he did not have an opportunity to give a closing argument. In his brief, Father emphasizes the importance of closing argument to a litigant's case. According to Father, "the trial court immediately launched into its oral ruling from the bench terminating the parental

rights of the father without affording the parties any opportunity to present a closing argument." Father says that the Juvenile Court thus deprived him of his right to fundamentally fair proceedings in this parental rights termination case.

Father was not prevented from giving a closing argument. The following exchange occurred before the Juvenile Court rendered its oral ruling: "THE COURT: No further proof? MR. BRASFIELD [Father's trial counsel]: No, Your Honor. THE COURT: All right." Clearly, Father was not denied a closing argument. If Father's counsel wanted to give a closing argument, he could have simply spoken up and asked the Juvenile Court for a chance to give one. It may well have been a tactical choice by Father's counsel to not give a closing argument. At any rate, Father had the opportunity to give a closing argument or to at least ask to be allowed to do so and chose not to do so. This issue is without merit.

We next address whether Father was denied fundamentally fair proceedings because the Juvenile Court relied in part on evidence from an anonymous psychosexual evaluator after that evidence came in without objection by Father's trial counsel. At the hearing, DCS worker Moseley testified to the recommendations of Father's psychosexual evaluator. Father says that this was highly prejudicial hearsay testimony and that, notwithstanding the fact that Father's trial counsel did not object, its admission violated Father's due process rights and right to fundamentally fair proceedings in this parental rights termination case.

As Father acknowledges, a party's failure to object normally results in waiver. "Failure to object [to] evidence in a timely and specific fashion precludes taking issue on appeal with the admission of the evidence." *Grandstaff v. Hawks*, 36 S.W.3d 482, 488 (Tenn. Ct. App. 2000). There is no reason to depart from the general rule here. Father's counsel had the opportunity to object but did not. Father was not denied fundamentally fair procedures. In addition, it may well have been a tactical choice by Father's counsel to not object so as not to force DCS to have the psychosexual evaluator testify live before the Juvenile Court. This issue is without merit.

We next address whether the Juvenile Court erred in finding the ground of abandonment by wanton disregard. In *In re Audrey S.*, this Court discussed examples of conduct amounting to wanton disregard for the welfare of a child: "We have repeatedly held that probation violations, repeated incarceration, criminal behavior, substance abuse, and the failure to provide adequate support or supervision for a child can, alone or in combination, constitute conduct that exhibits a wanton disregard for the welfare of a child." *In re Audrey S.*, 182 S.W.3d 838, 867-68 (Tenn. Ct. App. 2005). As relevant to this ground, the Juvenile Court found: "[Father] has engaged in conduct that exhibits a wanton disregard for the child's welfare by assaulting the mother of the child, which resulted in his incarceration since April 10, 2023, and his subsequent guilty plea to Aggravated Assault."

Father does not focus on the April 2023 incident, but instead points to positive things that he did, like acquiring a legal means of transportation, to show he was "making genuine efforts to establish a meaningful relationship with his son." Father also points to his participation in the Healing the Home program. However, Father's participation in Healing the Home is especially uncompelling in light of Moseley having testified that Father "engage[d] in those services right before the incident in April 2023." Clearly, whatever lessons the program was supposed to impart on Father regarding domestic violence were not heeded by him. That Father checked some boxes in other areas fails to overcome or negate the fact that he committed aggravated assault against Mother. Father's egregious violence toward Mother, which also left him unavailable to parent the Child, demonstrates wanton disregard for the Child's welfare. The evidence does not preponderate against the Juvenile Court's findings relative to this issue. We find by clear and convincing evidence, as did the Juvenile Court, that the ground of wanton disregard was proven against Father.

We next address whether the Juvenile Court erred in finding the ground of substantial noncompliance with the permanency plans. Father says that he complied with many of his responsibilities under the permanency plans. As examples, Father notes his consistent visitation with the Child when he was able to visit; his undergoing an alcohol and drug assessment; his engaging in domestic violence services; his obtaining employment on certain occasions; his obtaining bus passes; his finding housing at a hotel; and his submitting to a psychosexual evaluation. Regarding the Juvenile Court's findings as to Father's areas of noncompliance with the permanency plans, Father argues that his failure to heed the psychosexual evaluator's recommendations should not be held against him because that evidence was hearsay; that Father actually completed parenting education because he received a certificate from a course called "Men of Valor" that has the words "Malichi Dads" listed on it indicating some type of parenting education was involved; that Father had been employed at various times; and that DCS had previously not objected to Father's former housing at the hotel as being inappropriate.

The record reflects that Father indeed did do some of the things he was required to do under the permanency plans. However, even crediting that Father completed parenting classes through Men of Valor, that he had housing before he went to jail (albeit at a hotel), and that he worked from time to time (albeit without consistent verification), Father's positive steps were dwarfed by his areas of noncompliance. We already have rejected Father's argument about the psychosexual evaluator. Any issue concerning the psychosexual evaluator's recommendations are waived for failure to timely object below. Father's adamant refusal to comply with the psychosexual evaluator's recommendations is a major instance of noncompliance given that Father is a registered sex offender who had an inappropriate relationship with a 12 year old child. Another major instance of noncompliance was Father's failure to address his domestic violence problem. Father

-17-

committed aggravated assault against Mother after having engaged with Healing the Home services. This shows that Father, despite checking some boxes on the permanency plans, was not serious about the lessons. We conclude that Father's noncompliance with the permanency plans was substantial. The evidence does not preponderate against the Juvenile Court's findings as to this ground. We find by clear and convincing evidence, as did the Juvenile Court, that the ground of substantial noncompliance with the permanency plans was proven against Father.

We next address whether the Juvenile Court erred in finding the ground of failure to manifest an ability and willingness to assume custody. This ground has two prongs. Regarding the first prong of our analysis, our Supreme Court has explained that "[i]f a person seeking to terminate parental rights proves by clear and convincing proof that a parent or guardian has failed to manifest either ability or willingness, then the first prong of the statute is satisfied." *In re Neveah M.*, 614 S.W.3d 659, 677 (Tenn. 2020). The second prong of the statute requires the court to consider whether placing the child in the person's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child. *See* Tenn. Code Ann. § 36-1-113(g)(14). Father argues with respect to willingness that he made substantial efforts to overcome the obstacles that led to the Child being placed in state custody. However, Father's refusal to follow the recommendations of the psychosexual evaluator casts doubt on his willingness to assume personal custody of the Child. Furthermore, Father's violence against Mother also contradicts his assertion of willingness. Regarding the ability to parent, Father argues that, with the possibility that he may be placed on probation at some point, "there is serious and substantial doubt as to the Department's claim that the father would not have had the ability to assume custody of his son within the near future had his parental rights not been terminated." On the contrary, we have no serious or substantial doubt. Father is incarcerated for having assaulted Mother. His release date is unknown based on the record before us. When asked at trial if he could provide the Child with a home, he said that he might be able to find a relative willing to do so. That is insufficient. Father has shown no ability to safely parent the Child. The evidence is clear and convincing that Father has manifested neither a willingness nor an ability to assume custody of the Child.

Regarding the second prong of this ground, given Father's lack of suitable housing or verifiable income, his unknown release date, his history of domestic violence, and failure to cooperate with the psychosexual evaluator's recommendations, we find, as did the Juvenile Court, that placing the Child in Father's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the Child. Both prongs of this ground are proven by the requisite clear and convincing evidence. We find by clear and convincing evidence, as did the Juvenile Court, that the ground of failure to manifest an ability and willingness to assume custody was proven against Father.

The final issue we address is whether the Juvenile Court erred in finding that termination of Father's parental rights is in the Child's best interest. On June 14, 2023, when DCS filed its petition, the statutory best interest factors read as follows:

(i)(1) In determining whether termination of parental or guardianship rights is in the best interest of the child, the court shall consider all relevant and child-centered factors applicable to the particular case before the court. Those factors may include, but are not limited to, the following:
(A) The effect a termination of parental rights will have on the child's critical need for stability and continuity of placement throughout the child's minority;
(B) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological, and medical condition;
(C) Whether the parent has demonstrated continuity and stability in meeting the child's basic material, educational, housing, and safety needs;
(D) Whether the parent and child have a secure and healthy parental attachment, and if not, whether there is a reasonable expectation that the parent can create such attachment;
(E) Whether the parent has maintained regular visitation or other contact with the child and used the visitation or other contact to cultivate a positive relationship with the child;
(F) Whether the child is fearful of living in the parent's home;
(G) Whether the parent, parent's home, or others in the parent's household trigger or exacerbate the child's experience of trauma or post-traumatic symptoms;
(H) Whether the child has created a healthy parental attachment with another person or persons in the absence of the parent;
(I) Whether the child has emotionally significant relationships with persons other than parents and caregivers, including biological or foster siblings, and the likely impact of various available outcomes on these relationships and the child's access to information about the child's heritage;
(J) Whether the parent has demonstrated such a lasting adjustment of circumstances, conduct, or conditions to make it safe and beneficial for the child to be in the home of the parent, including consideration of whether there is criminal activity in the home or by the parent, or the use of alcohol, controlled substances, or controlled substance analogues which may render the parent unable to consistently care for the child in a safe and stable manner;
(K) Whether the parent has taken advantage of available programs, services, or community resources to assist in making a lasting adjustment of circumstances, conduct, or conditions;

(L) Whether the department has made reasonable efforts to assist the parent in making a lasting adjustment in cases where the child is in the custody of the department;

(M) Whether the parent has demonstrated a sense of urgency in establishing paternity of the child, seeking custody of the child, or addressing the circumstance, conduct, or conditions that made an award of custody unsafe and not in the child's best interest;

(N) Whether the parent, or other person residing with or frequenting the home of the parent, has shown brutality or physical, sexual, emotional, or psychological abuse or neglect toward the child or any other child or adult;

(O) Whether the parent has ever provided safe and stable care for the child or any other child;

(P) Whether the parent has demonstrated an understanding of the basic and specific needs required for the child to thrive;

(Q) Whether the parent has demonstrated the ability and commitment to creating and maintaining a home that meets the child's basic and specific needs and in which the child can thrive;

(R) Whether the physical environment of the parent's home is healthy and safe for the child;

(S) Whether the parent has consistently provided more than token financial support for the child; and

(T) Whether the mental or emotional fitness of the parent would be detrimental to the child or prevent the parent from consistently and effectively providing safe and stable care and supervision of the child.

(2) When considering the factors set forth in subdivision (i)(1), the prompt and permanent placement of the child in a safe environment is presumed to be in the child's best interest.

(3) All factors considered by the court to be applicable to a particular case must be identified and supported by specific findings of fact in the court's written order.

(4) Expert testimony is not required to prove or disprove any factor by any party.

(5) As used in this subsection (i), "parent" includes guardian.

Tenn. Code Ann. § 36-1-113(i) (West May 11, 2023 to June 30, 2023).

Regarding how courts are to apply the statutory factors in a best interest determination, our Supreme Court has stated:

> Ascertaining a child's best interests involves more than a "rote examination" of the statutory factors. *In re Audrey S.*, 182 S.W.3d at 878.

And the best interests analysis consists of more than tallying the number of statutory factors weighing in favor of or against termination. *White v. Moody*, 171 S.W.3d 187, 193-94 (Tenn. Ct. App. 2004). Rather, the facts and circumstances of each unique case dictate how weighty and relevant each statutory factor is in the context of the case. *See In re Audrey S.*, 182 S.W.3d at 878. Simply put, the best interests analysis is and must remain a factually intensive undertaking, so as to ensure that every parent receives individualized consideration before fundamental parental rights are terminated. *In re Carrington H.*, 483 S.W.3d at 523. "[D]epending upon the circumstances of a particular child and a particular parent, the consideration of one factor may very well dictate the outcome of the analysis." *In re Audrey S.*, 182 S.W.3d at 878 (citing *White v. Moody*, 171 S.W.3d at 194).

*In re Gabriella D.*, 531 S.W.3d 662, 682 (Tenn. 2017).

Father argues that the Juvenile Court erred in its best interest analysis. He states that there was "minimal information" about the Child's foster care placement; that Father regularly visited the Child prior to his incarceration and there is no evidence that the Child lacked an attachment to him; that there was no evidence that the Child is afraid of Father or that the Child's being with Father triggers any trauma; that the Child has numerous biological siblings and that termination of Father's parental rights would mean he likely will never meet them; that Father made considerable efforts to address DCS's concerns through attending Healing the Home classes, maintaining housing and employment, submitting to a psychosexual evaluation, visiting the Child, and completing the Men of Valor course; that there is scant evidence regarding DCS's efforts; that Father's sex offense which led to his being placed on the sex offender register happened decades ago; that there is a scarcity of information regarding why removal was required in the first place; that the Juvenile Court cited no evidence for its finding that Father's home environment was unsafe; and that the only evidence that Father is unfit to parent the Child came in the form of hearsay regarding the psychosexual evaluation.

Father is correct in that he complied with certain of his responsibilities under the permanency plans. He took parenting and domestic violence classes, for example. He was employed at least some of the time. He also visited the Child regularly when he was able to, although he did not do the actual tasks of caring for the Child. These facts are to Father's credit. The Juvenile Court found that factors (E), (F), (G), (P), and (S) did not weigh in favor of termination.

However, as our Supreme Court stated in *In re Gabriella D.*, a best interest analysis is not a rote tallying of the statutory factors—depending on facts of a given case, a single factor may be decisive. Here, several factors are of particular weight given the

circumstances of the case. Regarding factor (N), Father says that "the trial court made much of the fact that the father was on the sex offender registry as a result of a crime committed against a child." Indeed, the Juvenile Court did. This was appropriate. Not only is Father a registered sex offender, but he also adamantly refused to comply with the recommendations of his psychosexual evaluation as addressed in the Juvenile Court's findings relative to factor (K). This poses a danger to the Child, as Father was assessed to be a high-level risk to re-offend.

Another major issue in this case is domestic violence. Father points repeatedly to his participation in Healing the Home. It is commendable that Father participated in Healing the Home. It also is not dispositive. Father assaulted Mother after taking some of these classes. Clearly, he did not heed their lessons, and his domestic violence problem remains effectively unaddressed. Father's trial testimony was telling. He insisted that the police report was "plagiarized." He denied doing what he was accused of doing despite having pled guilty to aggravated assault in connection with the incident. Father has not remedied his domestic violence problem, and the Child should not be exposed to Father's violence, implicating factor (J).

In sum, Father has shown no ability to parent the Child. He has had 22 other children and did not have custody of them either. While he visited the Child, he did not attend to the mundane tasks of parenting. He is incarcerated, with an uncertain release date that could be years into the future. His prior home was at a hotel. He has no firm idea of where the Child could go if custody were restored to him, testifying that perhaps a relative could take him in. By contrast, the Child is in a stable foster home. While Father says that the evidence was minimal regarding the Child's current foster care placement, Foster Mother testified in some detail to the treatment that the Child is receiving, as well as his progress. There is no hint whatsoever that Father could similarly provide for the Child's specific needs or even provide minimal stability for the Child. The evidence does not preponderate against the Juvenile Court's findings relative to the Child's best interest. We find by clear and convincing evidence, as did the Juvenile Court, that termination of Father's parental rights is in the Child's best interest.

## Conclusion

The judgment of the Juvenile Court is affirmed, and this cause is remanded to the Juvenile Court for collection of the costs below. The costs on appeal are assessed against the Appellant, Charles S., and his surety, if any.

_____
D. MICHAEL SWINEY, CHIEF JUDGE